IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| DALLIN MONTGOMERY, NICK HOLDWAY, KEVIN WALTERS, OREGON FIREARMS FEDERATION, INC., and FIREARMS POLICY COALITION, INC., <br><br> Plaintiffs, <br> v. <br><br> ELLEN ROSENBLUM, in her official capacity as Oregon Attorney General, and CASEY CODDING, in his official capacity as Superintendent of the Oregon State Police, <br><br> Defendants. | Case No.: 3:24-cv-01273-AN <br><br> OPINION AND ORDER |

Plaintiffs Dallin Montgomery, Nick Holdway, Kevin Walters, Oregon Firearms Federation, Inc., and Firearms Policy Coalition, Inc. (collectively, "plaintiffs") bring this action against defendants Ellen Rosenblum and Casey Codding (collectively, "defendants") alleging violations of their Second Amendment and Fourteenth Amendment rights under 42 U.S.C. § 1983. On August 7, 2024, plaintiffs filed a Motion for Temporary Restraining Order, ECF [9]. Oral argument was held on August 15, 2024. For the following reasons, plaintiffs' motion is DENIED.

## LEGAL STANDARD

Temporary restraining orders are subject to substantially the same factors as preliminary injunctions. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Generally, a plaintiff seeking a preliminary injunction must show: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in favor of the plaintiff; and (4) an injunction is in the public interest. *Id.* at 20.

The Ninth Circuit uses a "serious questions" test which dictates that "serious questions

1

going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *All. For the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). Thus, under the serious questions test, a preliminary injunction can be granted if there is a likelihood of irreparable injury to the plaintiff, serious questions going to the merits, the balance of hardships tips in favor of the plaintiff, and the injunction is in the public interest. *M.R. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012). When the government is a party, courts consider the balance of equities and public interest factors together. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

## BACKGROUND

On July 13, 2023, the Oregon legislature enacted House Bill ("HB") 2005. In relevant part, this bill added three new provisions to chapter 166 of the Oregon Revised Statutes ("ORS"): ORS §§ 166.265, 166.266, and 166.267. ORS § 166.265 went into effect immediately upon passage of HB 2005, and states:

> "(1)(a) A person may not knowingly manufacture or cause to be manufactured within this state, import into this state, or offer for sale, sell or transfer, an undetectable firearm.
> (b) A violation of paragraph (a) of this subsection is a Class B felony.
> (2)(a) A person may not knowingly possess an undetectable firearm.
> (b)(A) A violation of paragraph (a) of this subsection is a Class A misdemeanor.
> (B) Notwithstanding subparagraph (A) of this paragraph, a violation of paragraph (a) of this subsection is a Class B felony if, at the time of the offense, the person has one or more prior convictions under this section or ORS 166.266 or 166.267.
> (3) A person convicted under this section shall forfeit the undetectable firearm.
> (4) As used in this section, "prior conviction" includes a conviction for a violation offense."

An "undetectable firearm" is defined as a firearm that is:

> "(a) constructed or produced, including through a three-dimensional printing process, entirely of nonmetal substances;
> (b) that, after removal of grips, stocks and magazines, is not detectable as a security exemplar by a walk-through metal detector calibrated to detect the security exemplar; or
> (c) that includes a major component that, if subjected to inspection by the types of x-ray machines commonly used at airports, would not generate an image that accurately depicts the shape of the component."

ORS § 166.210(17). ORS § 166.266 states:

> "(1)(a) A person may not knowingly offer for sale, sell or transfer a firearm unless the firearm has been imprinted with a serial number by a federally licensed firearm manufacturer, importer or dealer, or a gunsmith with a federal firearms license, in accordance with federal law.

> (b) A person may not knowingly possess a firearm unless the firearm has been imprinted with a serial number by a federally licensed firearm manufacturer, importer or dealer, or a gunsmith with a federal firearms license, in accordance with federal law.
> (2) This section does not apply to:
> (a) Antique firearms;
> (b) Firearms manufactured prior to October 22, 1968;
> (c) Firearms rendered permanently inoperable;
> (d) The sale, offer to sell, or transfer of a firearm to, or possession of a firearm by, a person licensed as a firearm manufacturer, importer or dealer under 18 U.S.C. 923; or
> (e) A gunsmith taking possession of a firearm for the purpose of imprinting the firearm with a serial number in accordance with federal law.
> (3)(a) A violation of subsection (1)(a) of this section constitutes a Class B violation.
> (b) Notwithstanding paragraph (a) of this subsection, a violation of subsection (1)(a) of this section is a Class A misdemeanor if, at the time of the offense, the person has a prior conviction under this section or ORS 166.265 or 166.267.
> (c) Notwithstanding paragraphs (a) and (b) of this subsection, a violation of subsection (1)(a) of this section is a Class B felony if, at the time of the offense, the person has two or more prior convictions under this section or ORS 166.265 or 166.267.
> (d) A violation of subsection (1)(b) of this section occurring before September 1, 2024, does not constitute an offense.
> (4) A person convicted of any offense under this section shall forfeit the firearm.
> (5) As used in this section, "prior conviction" includes a conviction for a violation offense."

ORS § 166.267 states:

> "(1)(a) A person may not knowingly import into this state, offer for sale, sell or transfer an unfinished frame or receiver unless:
> (A) The person is licensed as a firearm dealer under 18 U.S.C. 923;
> (B) The name of the manufacturer and an individual serial number is conspicuously placed on the unfinished frame or receiver in accordance with the procedures for the serialization of a firearm in 18 U.S.C. 923(i) and all regulations under the authority of 18 U.S.C. 923(i), including but not limited to 27 C.F.R. 478.92; and
> (C) The person maintains records relating to the unfinished frame or receiver in accordance with the procedures for record keeping related to firearms in 18 U.S.C. 923(g) and all regulations issued under the authority of 18 U.S.C. 923(g), including but not limited to 27 C.F.R. 478.121 to 478.134.
> (b)(A) A violation of paragraph (a) of this subsection is a Class B violation.
> (B) Notwithstanding subparagraph (A) of this paragraph, a violation of paragraph (a) of this subsection is a Class A misdemeanor if, at the time of the offense, the person has a prior conviction under this section or ORS 166.265 or 166.266.
> (C) Notwithstanding subparagraphs (A) and (B) of this paragraph, a violation of paragraph (a) of this subsection constitutes a Class B felony if, at the time of the offense, the person has two or more prior convictions under this section or ORS 166.265 or 166.266.
> (2)(a) A person may not knowingly possess an unfinished frame or receiver that is not serialized as provided in subsection (1)(a)(B) of this section, unless:
> (A) The person is a federally licensed gun manufacturer; and
> (B) The unfinished frame or receiver is an unfinished part within a manufacturing process that includes serialization.
> (b) A violation of paragraph (a) of this subsection occurring before September 1, 2024, does not constitute an offense."

An "unfinished frame or receiver" is defined as

> "(a) a forging, casting, printing, extrusion, machined body or similar item that:
> (A) Is designed to or may readily be completed, assembled or otherwise converted to function as a frame or receiver; or
> (B) Is marketed or sold to the public to be completed, assembled or otherwise converted to function as a frame or receiver.
> (b) 'Unfinished frame or receiver' does not include a component designed and intended for use in an antique firearm."

ORS § 166.210(18). Based on these provisions, plaintiffs move for a temporary restraining order to enjoin enforcement of ORS §§ 166.265(1)(a)-(b), (2)(a)-(b), 166.266(1)(a)-(b), (3)(a)-(c), and 166.267(1)(a)-(b), (2)(a).

## DISCUSSION

### A.    Likelihood of Success on the Merits

The Second Amendment to the United States Constitution states, "A well regulated Militia, being necessary to the security of a free state, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment protects an individual's right to keep and bear arms, unconnected with militia service, because "the inherent right of self defense" is "central to the Second Amendment right." *District of Columbia v. Heller*, 554 U.S. 570, 583, 628 (2008). However, this right, like most, is not unequivocal. *Id.* at 626. That is, the Second Amendment does not encompass the right "to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.*

Under *New York State Rifle & Pistol Association v. Bruen*, Second Amendment challenges are assessed using a two-step inquiry. 597 U.S. 1 (2022). First, the plaintiff must show that the plain text of the Second Amendment covers the conduct regulated by the challenged law. *Id.* at 17. If this conduct is covered by the plain text of the Second Amendment, then the Constitution presumptively protects that conduct, and the burden then shifts to the government to demonstrate that "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

Plaintiffs contend that the regulated conduct implicates (1) the right to self-manufacture arms, and (2) the right to keep and bear arms. Although the parties agree as to the applicability of this two-step inquiry, they disagree about the scope of the first inquiry. In defendants' view, the relevant question

4

is whether the regulation affects bearable arms in common use by law-abiding citizens for lawful purposes. However, in plaintiffs' view, the only question is whether the regulation affects "bearable arms," and subsequent questions about common use are reserved for the second prong. They argue that "bearable arms" looks only to the type of firearm at issue, *e.g.*, a handgun, a rifle, etc., without regard for distinguishing features of the firearm.

Plaintiffs' position cannot be squared with applicable law. In essence, plaintiffs would have this Court reduce the first prong to the most basic of inquiries: Does the regulation affect a firearm? There would be no assessment of any distinguishing features of the firearm—if it is a handgun, the right to keep and bear it is protected. Yet, the Second Amendment does not protect the right to keep and bear all firearms, regardless of its use and purpose. *See Heller*, 554 U.S. at 583. Indeed, in *Heller*, the Supreme Court stated that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, *such as short-barreled shotguns*." *Id.* at 625. It is difficult to perceive how short-barreled shotguns, which are merely a modified version of a shotgun, would fall outside the purview of Second Amendment protection if the only relevant question is whether the regulation affects a bearable arm. That is, if the only assessment was whether the regulation affected *a* bearable arm, a short-barreled shotgun should have fallen under the scope of Second Amendment protection because it was a shotgun. That the *Heller* Court did not arrive at this conclusion demonstrates that the inquiry goes beyond mere classification and examines distinguishing features.

Therefore, to assess whether plaintiffs' conduct falls under the Second Amendment's protection, plaintiffs must demonstrate that unserialized firearms, undetectable firearms, and unserialized, unfinished frames and receivers are bearable arms in common use by law-abiding citizens for lawful purposes. Defendants' arguments focus primarily on the common use and lawful purpose aspects, and they do not substantively address whether these items constitute bearable arms. Thus, the Court considers this point conceded for purposes of this motion.

Plaintiffs offer no evidence or argument to support the implication that these items are in common use for lawful purposes. Plaintiffs make the conclusory statement in their motion that "the firearms

subject to [Oregon's laws] are 'arms' 'in common use' for lawful purposes." Pl. Mot. For Temp. Restraining Order, ECF [9], at 7. However, defendants have proffered evidence indicating that unserialized and undetectable firearms are increasingly used for distinctly unlawful purposes. For example, in 2022, the Bureau of Alcohol, Tobacco, and Firearms ("ATF") promulgated a final rule that, in relevant part, requires federal firearm licensees to serialize any unserialized privately made firearms ("PMFs") that they take into inventory. Bureau of Alcohol, Tobacco, and Firearms, Final Rule, Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652 (Apr. 26, 2022). The rule does not require unlicensed individuals to serialize PMFs.

In its discussion of the rule, the ATF noted that "the number of PMFs recovered from crime scenes throughout the country in recent years" has increased. *Id.* at 24,656. ATF records the number of firearms that law enforcement submits to the agency for tracing and, from January 1, 2016 through December 31, 2021, approximately 45,240 suspected PMFs were reported to ATF as having been recovered by law enforcement from potential crime scenes.[1] *Id.* Of those 45,240, 1,758 were reported in 2016, 2,552 were reported in 2017, 3,960 were reported in 2018, 7,517 were reported in 2019, 10,109 were reported in 2020, and 19,344 were reported in 2021. *Id.* Further, it noted that "the proliferation of untraceable firearms severely undermines [law enforcement's tracing process]." *Id.* at 24,659. ATF attempted to trace each of the 45,240 PMFs but was only able to successfully trace 445 PMFs to an individual unlicensed purchaser. *Id.*

In response to concerns that the final rule would impact Second Amendment rights, ATF highlighted that "[a]s a matter of common sense, unserialized firearms are inherently attractive to criminals, and therefore pose a risk to public safety." *Id.* at 24,677. For example, "the absence of markings on PMFs makes it extremely difficult for law enforcement to determine where, by whom, or when they were manufactured, and to whom they were sold or otherwise disposed." *Id.* at 24,656.

---

[1] The ATF believes this number to be "far lower than the actual number of PMFs recovered from crime scenes because some law enforcement departments incorrectly trace some PMFs as commercially manufactured firearms, or may not see a need to use their resources to attempt to trace firearms with no serial numbers or other identifiable markings." 87 Fed. Reg. at 24,656 n.18.

Similar concerns were raised in a May 2019 congressional report from the Committee on Homeland Security. In that report, the committee noted that PMFs "hamstring law enforcement's ability to investigate crimes committed with untraceable weapons," and emphasized that "[t]he wide availability of ghost guns and the emergence of functional 3D-printed guns are a homeland security threat. Terrorists and other bad actors may seek to exploit the availability of these weapons for dangerous ends." H. Rep. No. 116-88 (2019). That report also discussed a January 2019 congressional report from the Joint Intelligence Bulletin issued by the Department of Homeland Security ("DHS"), the Federal Bureau of Investigation, and the National Counterterrorism Center that stated, "[T]hese rapidly evolving technologies pose an ongoing, metastasizing challenge to law enforcement in understanding, tracking, and tracing ghost guns." *Id.* Further, the report acknowledged an intelligence assessment issued by DHS in April of 2019, which reiterated that "ghost guns pose an urgent and evolving threat to the homeland, particularly in the hands of ideologically motivated lone wolf actors." *Id.*

Put simply, defendants have offered substantial evidence indicating that, to the extent unserialized firearms are in common use, they are in common use for *unlawful* purposes. Plaintiffs offer no compelling evidence or arguments to rebut this implication. At oral argument, plaintiffs pointed out that the ATF 2022 Rule noted that approximately one million individual owners would be impacted by the regulation of unserialized guns. 87 Fed. Reg. at 24,731. Based on this, plaintiffs argue that unserialized firearms are in common use. However, in doing so, plaintiffs erroneously "equate 'commonly owned' with 'in common use today for self-defense.'" *Or. Firearms Fed. v. Kotek*, 682 F. Supp. 3d 874, 915 (D. Or. 2023). That is not the nature of this inquiry.

Numerous courts have found that unserialized and undetectable firearms are not in common use for lawful purposes. *See, e.g.*, *United States v. Marzzarella*, 614 F.3d 85, 95 (3d Cir. 2010) (finding "no compelling reason why a law-abiding citizen would prefer an unmarked firearm"), *abrogated on other grounds by Range v. Attorney Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023); *Price*, __ F.4th __, 2024 WL 3665400, at *10 (4th Cir. 2024) (finding no "common-sense reason for a law-abiding citizen to want to use a firearm with an obliterated serial number for self-defense"); *United States v. Reyna*,

7

No. 3:21-CR-41 RLM-MGG, 2022 WL 17714376, at *5 (N.D. Ind. Dec. 15, 2022) ("A law-abiding citizen who uses a gun for self-defense has no reason to prefer a deserialized gun to a gun with a serial number intact."). Plaintiffs argue that these cases, and the other cases cited by defendants, are irrelevant because they address 18 U.S.C. § 922(k), which prohibits *removing* serial numbers from firearms. What plaintiffs fail to identify, however, is any meaningful difference between wanting to manufacture an unserialized firearm and wanting to remove a serial number from a firearm—in both instances, the goal is obtaining an unserialized firearm. Plaintiffs have offered no evidence to indicate that the purpose of manufacturing an unserialized firearm would differ in any respect from the purpose in removing a serial number from a firearm. That purpose, in the view of a majority of courts, is not lawful, and this Court agrees with this well-reasoned conclusion.

The same is true of undetectable firearms. "A gun made from plastic is virtually undetectable in metal detectors and other security equipment intended to promote public safety at airports, sporting events, courthouses, music venues, and government buildings." *Washington v. U.S. Dep't of State*, 318 F. Supp. 3d 1247, 1261 (W.D. Wash. 2018). Like unserialized guns, undetectable firearms can "hamper law enforcement efforts to prevent and/or investigate crime" by "thwart[ing] the use of standard forensic techniques to link a particular projectile to a particular weapon." *Id.* Again, plaintiffs have offered no evidence as to why, aside from illicit purposes, a law-abiding citizen would prefer an undetectable firearm.

The only case that plaintiffs identify with a different outcome is *Rigby v. Jennings*, 630 F. Supp. 3d 602 (D. Del. 2022). Yet this case is readily distinguishable. In *Rigby*, the District of Delaware court held that state laws similar to those at issue in the present case infringed on Second Amendment protections. *Id.* at 613. However, central to the court's holding was the fact that the Delaware laws "criminalize the possession of unserialized finished firearm frames and untraceable firearms *without providing any way for [the] Plaintiffs to keep firearms they lawfully manufactured*." *Id.* (emphasis added). Conversely, the Oregon laws expressly provide mechanisms for individuals to comply with the serialization requirements and, indeed, delayed enactment of provisions criminalizing possession until September 1, 2024, providing individuals with ample time to comply with the laws.

8

In sum, plaintiffs have offered no evidence to support the implication that unserialized firearms, undetectable firearms, or unserialized, unfinished frames and receivers are in common use by law-abiding citizens for lawful purposes. Indeed, the evidence presented indicates the opposite: that these types of firearms are most commonly used for illegal purposes. Because plaintiffs have not demonstrated that the conduct regulated by the Oregon laws is protected by the plain text of the Second Amendment, they have not demonstrated a likelihood of success on the merits.

**B.**     **Other *Winter* Factors**

Because plaintiffs have failed to meet the threshold inquiry of whether their claims are likely to succeed on the merits, this Court need not consider the other preliminary injunction factors. *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018). Plaintiffs have not established that they are entitled to the "extraordinary remedy" of a preliminary injunction.

IT IS SO ORDERED.

DATED this 20th day of August, 2024.

Adrienne Nelson
United States District Judge