Leonard W. Williamson, OSB #910020
VAN NESS WILLIAMSON LLP
960 Liberty St. SE, Suite 100
Salem, Oregon 97302
(503) 365-8800
l.williamson@vwllp.com

Bradley A. Benbrook*
Stephen M. Duvernay*
BENBROOK LAW GROUP, PC
701 University Avenue, Suite 106
Sacramento, California 95825
Telephone: (916) 447-4900
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

*Pro hac vice

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| DALLIN MONTGOMERY; NICK HOLDWAY; KEVIN WALTERS; OREGON FIREARMS FEDERATION; and FIREARMS POLICY COALITION, INC., <br><br> Plaintiffs, <br><br> v. <br><br> ELLEN ROSENBLUM, in her Official Capacity as Oregon Attorney General; and CASEY CODDING, in his Official Capacity as Superintendent of the Oregon State Police, <br><br> Defendants. | Case No.: 3:24-cv-01273-AN <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT AND, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................ 1

II.     STATEMENT OF THE CASE...................................................................................... 2

    A.    Oregon Bans the Sale and Possession of Constitutionally Protected
        Personally Manufactured Firearms As Well As Items Necessary to
        Personally Manufacture Protected Firearms ........................................................ 2

    B.    Oregon's Bans Have Impacted Plaintiffs' Second Amendment
        Protected Rights .................................................................................................... 3

    C.    Procedural Background ......................................................................................... 4

III.    LEGAL STANDARD .................................................................................................. 5

IV.     ARGUMENT ............................................................................................................... 6

    A.    Plaintiffs Have Stated A Claim That Oregon's Bans Violate The Second
        Amendment ........................................................................................................... 6

        1.    The Second Amendment's Plain Text Covers Plaintiffs'
            Proposed Course Of Conduct................................................................... 7

        2.    Oregon Cannot Show That Its Bans Are Consistent With
            The Nation's Historical Tradition Of Firearms Regulation ..................... 9

            a.    Contrary To The State's Core Argument, "Common Use" Is
                Considered During *Bruen*'s Historical Analysis, Where The
                Government Bears The Burden, And Not When Determining
                Whether Plaintiffs' Conduct Is Covered By The Second
                Amendment's Text.......................................................................... 9

            b.    Oregon's Bans Target Arms That Are In Common Use For
                Lawful Purposes, So The Bans Must Fall................................... 12

            c.    Oregon's Bans Are Inconsistent With Nation's Historical
                Tradition Of Firearms Regulation............................................... 15

    B.    Summary Judgment—In Plaintiffs' Favor—Is Proper ...................................... 17

V.      CONCLUSION.......................................................................................................... 17

## TABLE OF AUTHORITIES

**Cases**

*Al-Kidd v. Ashcroft,*
580 F.3d 949 (9th Cir. 2009) ................................................................. 5

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)............................................................................... 6

*Andrews v. State,*
50 Tenn. 165 (1871)............................................................................... 7

*Bianchi v. Brown,*
111 F.4th 438 (4th Cir. 2024) ............................................................. 14

*Caetano v. Massachusetts,*
577 U.S. 411 (2016)............................................................................. 13

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)............................................................................... 6

*District of Columbia v. Heller,*
554 U.S. 570 (2008)...................................................................... passim

*Drummond v. Robinson Township,*
9 F.4th 217 (3d Cir. 2021) ..................................................................... 7

*Ezell v. City of Chicago,*
651 F.3d 684 (7th Cir. 2011) ............................................................ 7, 8

*Garland v. Cargill,*
602 U.S. 406 (2024)............................................................................. 12

*Gilligan v. Jamco Dev. Corp.,*
108 F.3d 246 (9th Cir. 1997) ................................................................. 5

*Harrel v. Raoul,*
144 S. Ct. 2491 (2024)......................................................................... 12

*Heller v. District of Columbia,*
670 F.3d 1244 (D.C. Cir. 2011)........................................................... 12

*In re Oracle Corp. Secs. Litig.,*
627 F.3d 376 (9th Cir. 2010) ................................................................. 6

*Jacobson v. AEG Capital Corp.,*
50 F.3d 1493 (9th Cir. 1995) ................................................................. 6

*Johnson v. Riverside Healthcare Sys., LP,*
534 F.3d 1116 (9th Cir. 2008) ............................................................... 5

*Konigsberg v. State Bar of Cal.,*
366 U.S. 36 (1961)................................................................................. 9

*Lee v. City of Los Angeles,*
250 F.3d 668 (9th Cir. 2001) ................................................................. 5

*McGary v. City of Portland,*
386 F.3d 1259 (9th Cir. 2004) ............................................................... 5

*Moore v. Madigan,*
702 F.3d 933 (7th Cir. 2012) ............................................................... 13

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   597 U.S. 1 (2022) ............................................................................................. passim

*Olivier v. Baca*,
   913 F.3d 852 (9th Cir. 2019) ............................................................................. 6

*Parker v. District of Columbia*,
   311 F. Supp. 2d 103 (D.D.C. 2004) .................................................................. 13

*Rigby v. Jennings*,
   630 F. Supp. 3d 602 (D. Del. 2022) .................................................................. 8

*Swartz v. KPMG LLP*,
   476 F.3d 756 (9th Cir. 2007) ............................................................................. 5

*Teixeira v. County of Alameda*,
   873 F.3d 670 (9th Cir. 2017) ............................................................................. 7, 8

*Trinh v. Shriners Hosps. for Child.*,
   No. 3:22-cv-1999, 2024 WL 4378963 (D. Or. Aug. 9, 2024) ........................... 6

*United States v. Miller*,
   307 U.S. 174 (1939) ........................................................................................... 11

*United States v. Rahimi*,
   602 U.S. 680 (2024) ........................................................................... 10, 11, 17

**Statutes**
18 U.S.C. § 922(a)(1)(a) ....................................................................................... 14
18 U.S.C. § 922(k) ................................................................................................ 14
ORS § 166.210(17) & (18) ................................................................................... 3
ORS § 166.265 ...................................................................................................... 3
ORS § 166.266 ...................................................................................................... 3
ORS § 166.266(2)(b) ............................................................................................ 3
ORS § 166.267 ...................................................................................................... 3
ORS § 166.267(1)(a), (2)(a) ................................................................................. 3

**Other Authorities**
ATF, *What is ATF doing in regards to people making their own firearms* (May 14, 2015) ........ 14

Joseph Greenlee,
   *The American Tradition of Self-Made Arms*, 54 ST. MARY'S L.J. 36 (2023) ..................... 15, 16

Letter from Sec'y of State Thomas Jefferson to George Hammond, British Ambassador to the
   U.S., (May 15, 1793), in 7 THE WRITINGS OF THOMAS JEFFERSON (Paul Ford ed., 1904) ....... 15

William J. Krouse, *Gun Control: 3D-Printed AR-15 Lower Receivers*, Cong. Res. Serv. Insight
   (Aug. 22, 2018) .................................................................................................. 14

**Rules**
Fed. R. Civ. P. 56(a) ............................................................................................ 6

**Regulations**
Definition of "Frame or Receiver" and Identification of Firearms,
   87 Fed. Reg. 24,652 (Apr. 26, 2022) .......................................................... 13, 14, 15

# I. INTRODUCTION

In 2023, Oregon enacted House Bill 2005 ("HB 2005"), which among other things bans personally manufactured firearms ("PMFs") and objects that are not firearms, but may be manufactured into firearms by individuals (for convenience, Plaintiffs will refer to these items as "precursors" to frames or receivers, although these items may be used for other purposes or may never be manufactured into firearms) ("the Bans" or "Oregon's Bans"). The net effect of HB 2005 is to criminalize the personal manufacture of firearms, including those commonly owned by law-abiding individuals for lawful purposes. Oregon's Bans took effect on September 1, 2024. The Court must deny Defendants' motion to dismiss because Plaintiffs have adequately alleged that the Bans violate the Second Amendment.

Under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, the first question is whether "the Second Amendment's plain text covers an individual's conduct." 597 U.S. 1, 17 (2022). Here it does. Plaintiffs' proposed conduct—manufacturing arms, possessing the materials necessary to do so, and ultimately keeping and bearing such personally manufactured arms—falls within the Second Amendment's plain text. Plaintiffs seek to possess and self-manufacture "bearable arms" that are within the Second Amendment's coverage. Beyond that, the Second Amendment's protections extend to the corresponding right to acquire arms, which is implicated by Plaintiffs' desire to personally manufacture arms, possess the materials necessary to do so, and to keep and bear personally manufactured arms. As a result, "the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17.

Defendants' primary argument is that the Second Amendment's text does not cover Plaintiffs' proposed conduct because Plaintiffs have failed to establish that unserialized firearms are in common use for lawful purposes. This is incorrect as a matter of methodology and wrong as a matter of fact. As to methodology, "common use" is not a question of whether the Second Amendment's plain text covers Plaintiffs' proposed conduct, rather, it is a matter of historical analysis where the government bears the burden of proof. And as a matter of fact, Plaintiffs have

adequately alleged that, as an initial matter, the plain text of the Second Amendment covers Plaintiffs' conduct—a point firmly established under existing, binding Supreme Court precedent.

Under *Bruen*, the burden thus shifts to Oregon. It must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 24. Oregon cannot do so because there is a rich tradition throughout the Nation's history in favor of self-built arms and no tradition requiring that those arms be serialized.

More, although Plaintiffs do not bear the burden, Plaintiffs have also demonstrated that Oregon's Bans target firearms that are in common use for lawful purposes. Specifically, the First Amended Complaint details how Oregon's Bans reach Plaintiffs' possession of common Glock-style semiautomatic handguns and AR-style semiautomatic rifles—the only firearms at issue in the Complaint—which are each indisputably in common use for lawful purposes throughout the United States.

Throughout American history, people have been free to personally manufacture, construct, and/or assemble arms for all lawful purposes. In defiance of this historical tradition, Oregon's Bans completely and categorically prohibit individuals not prohibited from exercising their Second Amendment protected rights from possessing, acquiring, and personally manufacturing common categories of constitutionally protected firearms.

The motion to dismiss should be denied.

## II. STATEMENT OF THE CASE

A.  **Oregon Bans the Sale and Possession of Constitutionally Protected Personally Manufactured Firearms As Well As Items Necessary to Personally Manufacture Protected Firearms.**

In 2023, Oregon enacted HB 2005, which in relevant part effectively bans the sale and possession of constitutionally protected personally manufactured firearms and certain "precursor parts" and other materials necessary to personally manufacture constitutionally protected firearms.

HB 2005 includes the following definitions:

"Undetectable firearm" means a firearm:

(a) Constructed or produced, including through a three-dimensional printing process, entirely of nonmetal substances;

(b) That, after removal of grips, stocks and magazines, is not as detectable as a security exemplar by a walk-through metal detector calibrated to detect the security exemplar; or

(c) That includes a major component that, if subjected to inspection by the types of X-ray machines commonly used at airports, would not generate an image that accurately depicts the shape of the component.

"Unfinished frame or receiver" means a forging, casting, printing, extrusion, machined body or similar item that:

(A) Is designed to or may readily be completed, assembled or otherwise converted to function as a frame or receiver; or

(B) Is marketed or sold to the public to be completed, assembled or otherwise converted to function as a frame or receiver.

HB 2005-C, § 1, enacted at ORS § 166.210(17) & (18).

Oregon's Bans have significant criminal consequences. The Bans make it a felony to manufacture, import, offer for sale, sell, or transfer an "undetectable firearm," and makes possession of an undetectable firearm a misdemeanor (HB 2005-C, § 3, enacted at ORS § 166.265); make it a crime to offer for sale, sell, transfer, or possess an unserialized firearm (HB 2005-C, § 4, enacted at ORS § 166.266);[1] and generally criminalize importation, offering for sale, sale, transfer, and possession of an "unfinished frame or receiver" (HB 2005-C, § 5, enacted at ORS § 166.267).[2]

Put simply, Oregon's Bans make it a crime to sell, transfer, or possess an "unfinished frame or receiver" that lacks a serial number.

The provisions of Oregon's Bans that Plaintiffs challenge took effect on September 1, 2024.

**B.    Oregon's Bans Have Impacted Plaintiffs' Second Amendment Protected Rights.**

Each of the Individual Plaintiffs are ordinary, law-abiding Oregon residents and United States citizens that lawfully owned arms or PMFs that fall within Oregon's Bans before HB 2005's

---

[1] This prohibition does not reach firearms manufactured prior to October 22, 1968, when the federal Gun Control Act was enacted by Congress. ORS § 166.266(2)(b).

[2] An "unfinished frame or receiver," while not itself a firearm, may be used in the manufacture of a firearm. The two principal exceptions to this ban, not applicable here, are to: (1) allow a firearms dealer to sell an unfinished frame or receiver that has been serialized, subject to the recordkeeping requirements that apply to all firearm sales; and (2) permit manufacturers to possess an unfinished frame or receiver that will be serialized as part of the manufacturing process. HB 2005-C, § 5, enacted at ORS § 166.267(1)(a), (2)(a).

provisions took effect. Specifically, Plaintiff Dallin Montgomery possessed an item that falls within Oregon's Bans (an unserialized Glock-style semiautomatic pistol built from a polymer frame). FAC, ¶ 7. Plaintiff Nick Holdway possessed multiple items that fall within Oregon's Bans, including: an unserialized Glock-style semiautomatic pistol built from a polymer frame; an unserialized Glock-style polymer frame; an unserialized AR-platform rifle built from an "unfinished frame or receiver"; and an unserialized "unfinished frame or receiver" that he would manufacture into the receiver for an AR-platform rifle. FAC, ¶ 8. And Plaintiff Kevin Walters possessed multiple items that fall within Oregon's Bans (Walters used a 3D printer to manufacture frames for three Glock-style semiautomatic pistols using PLA+ filament). FAC, ¶ 9.

Each of the Individual Plaintiffs is a member of Plaintiffs Firearms Policy Coalition, Inc. ("FPC") and Oregon Firearms Federation ("OFF," collectively the "Organizational Plaintiffs"). FAC, ¶¶ 7–9.

As a result of Oregon's Bans, the Individual Plaintiffs and Organizational Plaintiffs' other members throughout Oregon were required to dispossess themselves of, render permanently inoperable, or (where possible) serialize their property before September 1, 2024, or risk fines up to $6,250 (misdemeanor) or $250,000 (Class B felony) and/or imprisonment up to 10 years. *See* ORS §§ 161.635; 161.605. Each of the Individual Plaintiffs desires and intends to regain possession of their now-prohibited items to further their exercise of their right to self-defense and for other lawful purposes and, but for Oregon's Bans and the threat of criminal sanctions, they would possess those items and also personally manufacture or acquire additional constitutionally protected firearms, including by purchasing currently banned items on the Internet through out-of-state retailers for shipment into Oregon. FAC, ¶¶ 7–9.

## C.    Procedural Background.

Plaintiffs filed this lawsuit on August 5, 2024, alleging a single claim under 42 U.S.C. § 1983 for violation of the Second Amendment as applicable to Oregon through the Fourteenth Amendment. ECF 1. Two days later, Plaintiffs filed a motion for temporary restraining order or preliminary injunction, which sought relief before HB 2005 took effect on September 1. ECF 9.

After holding oral argument on August 15, the Court issued an Opinion and Order on August 20 denying Plaintiffs' motion. ECF 29.

On September 17, the State filed a motion to dismiss and, in the alternative, for summary judgment. ECF 34. In response, Plaintiffs filed a First Amended Complaint as of right pursuant to Federal Rule of Civil Procedure 15(a)(1)(B). ECF 35, 36. The State filed this motion to dismiss the First Amended Complaint and, in the alternative, for summary judgment on October 22. ECF 37.

### III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss shall be granted where the plaintiff fails to state a claim upon which relief can be granted. "A Rule 12(b)(6) dismissal may be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (internal quotation marks and citation omitted). When reviewing a motion to dismiss, the Court is confined to "allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice" along with any "writing referenced in a complaint but not explicitly incorporated therein if the complaint relies on the document and its authenticity is unquestioned." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007). Furthermore, "[a]ll factual allegations set forth in the complaint 'are taken as true and construed in the light most favorable to [p]laintiffs.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (citation omitted).

At the motion to dismiss stage, "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). "Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *McGary v. City of Portland*, 386 F.3d 1259, 1261 (9th Cir. 2004) (citation omitted). Accordingly, Plaintiffs' allegations need only "nudge ... the claim across the line from conceivable to plausible." *Al-Kidd v. Ashcroft*, 580 F.3d 949, 976 (9th Cir. 2009).

Alternatively, the Court may treat this motion as a motion for summary judgment when it considers matters outside of the pleadings. *Jacobson v. AEG Capital Corp.*, 50 F.3d 1493, 1496 (9th Cir. 1995); *see Trinh v. Shriners Hosps. for Child.*, No. 3:22-cv-1999, 2024 WL 4378963, at *6 (D. Or. Aug. 9, 2024) (collecting authority). The Court must grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it could affect the outcome of the case under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Where, as here, the opposing party will have the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" *Olivier v. Baca*, 913 F.3d 852, 857 (9th Cir. 2019) (quoting *Celotex*, 477 U.S. at 325); *accord In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).

## IV. ARGUMENT

**A.     Plaintiffs Have Stated A Claim That Oregon's Bans Violate The Second Amendment.**

Plaintiffs have adequately alleged a claim that Defendants' enforcement of Oregon's Bans have and will continue to violate Plaintiffs' right to keep and bear arms protected under the Second and Fourteenth Amendments. To determine whether a firearm regulation is constitutional under *Bruen*, the analysis begins with the question of whether the Second Amendment's plain text covers an individual's conduct; if so, the Constitution presumptively protects that conduct. *See Bruen*, 597 U.S. at 22–24. If that requirement is satisfied, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. In other words, it is Oregon's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19 (cleaned up).

Plaintiffs have not only stated a claim that Oregon's Bans cannot withstand constitutional scrutiny under *Bruen*'s standard, they have demonstrated that Defendants cannot possibly meet

their burden to establish their Bans are tied to a historical tradition of firearm regulation surrounding the ratification of the Second Amendment. Plaintiffs are therefore entitled to judgment in their favor if this Court treats Defendants' motion as one for summary judgment.

1.     **The Second Amendment's Plain Text Covers Plaintiffs' Proposed Course Of Conduct.**

As described above, each of the Individual Plaintiffs lawfully owned constitutionally protected arms and/or "precursors" that fall within Oregon's Bans. Multiple lines of authority demonstrate that the Second Amendment's plain text covers Plaintiffs conduct here.

First, Plaintiffs seek to possess and self-manufacture "bearable arms" that are within the Second Amendment's coverage. The Supreme Court has already done the work necessary to demonstrate as much here: "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008); *see also Bruen*, 597 U.S. at 28 ("even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense").

Second, the Second Amendment protects ancillary rights that are necessary to exercise the individual right to "possess a firearm for self-defense" including "'the ability to acquire arms.'" *Teixeira v. County of Alameda*, 873 F.3d 670, 677–78 (9th Cir. 2017) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)); *Drummond v. Robinson Township*, 9 F.4th 217, 227 (3d Cir. 2021) (the Second Amendment "'implies a corresponding right to acquire and maintain proficiency' with common weapons" (quoting *Ezell*)). Nothing within the plain text of the Second Amendment limits the manner of arms acquisition—*i.e.*, limiting it to the purchase or acquisition from a third party. *See Teixeira*, 873 F.3d at 679 (the right "to keep" arms "necessarily involves" the right to "'keep them in a state of efficiency for use'" and "'to keep them in repair,'" which implies the right to self-repair (quoting *Andrews v. State*, 50 Tenn. 165, 178 (1871))).

These principles confirm that Plaintiffs' proposed course of conduct—to personally manufacture arms, possess the materials necessary to do so, and, at base, to keep and bear

personally manufactured arms—is covered by the Second Amendment's text. The right to personally manufacture "wouldn't mean much" without the right to own, possess, and use the items and materials necessary to engage in such activity—and, of course, the firearms ultimately produced, so long as such firearms are themselves protected by the Second Amendment and not subject to prohibition. *See Teixeira*, 873 F.3d at 677 (quoting *Ezell*, 651 F.3d at 704). As one district court has explained,

> [T]he right to keep and bear arms implies a corresponding right to manufacture arms. Indeed, the right to keep and bear arms would be meaningless if no individual or entity could manufacture a firearm. Thus, if possessing untraceable firearms is protected by the Second Amendment, then so too is manufacturing them.

*Rigby v. Jennings*, 630 F. Supp. 3d 602, 615 (D. Del. 2022).

Defendants cannot evade this conclusion by stating that the Second Amendment's plain text does not extend to *unserialized* firearms. As noted above, the plain text does not distinguish among bearable arms. In an effort to avoid its burden of justifying the regulation, the State is attempting to smuggle the regulation into the formulation of the proposed conduct by defining the conduct as possessing firearms without serial numbers. That is not how the test works. Because the Second Amendment's text—like other constitutional protections—is quite broad, the "coverage" question would have no meaning whatsoever if it the proposed conduct is defined to include the absence of a regulation: of course the Second Amendment's text does not discuss serial numbers. The cases confirm this. In *Bruen*, the proposed conduct was not defined as "carrying handguns publicly for self-defense without having to get a license after establishing a special need." Instead, the proposed conduct was simply "carrying handguns publicly for self-defense." 597 U.S. at 32. Likewise, the question in *Rahimi* was not whether the Second Amendment's text expressly covers possession of a firearm by those who are subject to domestic violence restraining orders. In short, whether the nature of the restriction violates the Second Amendment is the province of the historical analysis, not textual interpretation.

In any event, Americans have built firearms at home (without serializing them) since the Founding, and even federal law does not require serialization for home-built weapons. It would be

an extreme outlier to conclude that the Second Amendment's plain text categorically excludes unserialized firearms.

Because Plaintiffs' proposed course of conduct is covered by the Second Amendment's plain text, the Constitution "presumptively protects" their conduct. *Bruen*, 597 U.S. at 24.

2.    **Oregon Cannot Show That Its Bans Are Consistent With The Nation's Historical Tradition Of Firearms Regulation.**

Under *Bruen*, Oregon bears the burden of demonstrating that the Bans are consistent with this Nation's historical tradition of regulation contemporaneous with the ratification of the Second Amendment. It must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 24. Oregon cannot do so because, as shown below, there is a rich tradition throughout the Nation's history in favor of both self-manufacture and the possession of self-manufactured arms.

a.    **Contrary To The State's Core Argument, "Common Use" Is Considered During *Bruen*'s Historical Analysis, Where The Government Bears The Burden, And Not When Determining Whether Plaintiffs' Conduct Is Covered By The Second Amendment's Text.**

The State misconstrues the import of the Supreme Court's conclusion that "the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'" *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 627). *Heller* and *Bruen* establish the historical rule of decision for all arms-ban cases: arms that are "in common use" are absolutely protected and cannot be banned, a conclusion that is "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *See Heller*, 554 U.S. at 627. And because the firearms subject to the Oregon's Bans are "arms" "in common use" for lawful purposes, they are presumptively protected by the Second Amendment's "'unqualified command.'" *Bruen*, 597 U.S. at 17 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

Oregon's core argument is that "[t]he Second Amendment only protects arms that are in common use for lawful purposes," and therefore Plaintiffs supposedly bear the burden under *Bruen*'s textual analysis of demonstrating that this requirement is satisfied. Br. 4–5. From this

premise, the State further insists that Plaintiffs' case must be dismissed because they have failed to establish that unserialized firearms are in common use for lawful purposes. Br. 5–9. This is incorrect as a matter of methodology and wrong as a matter of fact.

By attempting to import the "common use" question into the determination whether the Second Amendment covers Plaintiffs' proposed conduct, the State once again improperly jumbles the test under *Heller* and *Bruen*. The preliminary question is whether the "plain text" of the Second Amendment protects the conduct in which the Plaintiffs wish to engage but is banned by the statute. *Bruen* repeatedly emphasized that the subject of this analysis is the Amendment's "plain text," 597 U.S. at 17, 24, 32, 33, or "bare text," *id.* at 44 n.11. This is an obvious initial inquiry, as when one considers that something must be speech to be protected under the Free Speech Clause of the First Amendment or must be a search or seizure to implicate the Fourth Amendment. The question here, then, is what was understood by the term "arms" at the Founding. *Heller* has already answered this question: "The 18th-century meaning is no different from the meaning today." 554 U.S. at 581. And because Oregon's laws challenged here bans firearms, the plain text is implicated and the burden falls to the State to justify its law. Whether these arms are in "common use" has nothing to do with this textual coverage question.

Oregon quotes this Court's previous opinion expressing credulity that this textual analysis could be satisfied by "the most of basic of inquiries" into whether a challenged regulation "affect[s] a firearm." Br. 7 (quoting TRO Op., ECF 29 at 5). But this is precisely what the Supreme Court's opinions demand: If the "plain" or "bare" text of the Second Amendment is implicated, then the course of conduct is "presumptively protect[ed]." Other questions—such as whether a regulated arm is in "common use," or whether it is by contrast "dangerous and unusual" is reserved for the subsequent historical analysis based on whether a regulation is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17; *see also United States v. Rahimi*, 602 U.S. 680, 692 (2024) ("[T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition[.]").

*Heller* demonstrates this distinction. *Heller* involved a ban on a type of firearm (there, handguns). After *Heller* determined the plain text of the Second Amendment presumptively covered all firearms as "arms," the Court in Part III of its opinion turned to historical limitations on the textual scope of the right. *See* 554 U.S. at 626–28. It was through examining this history that the Court concluded that, despite its expansive textual scope, ultimately the Second Amendment "was not a right to keep and carry any weapon whatsoever." *Id*. at 626. Rather, the type of arms that are protected is limited by "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id*. at 627. This was, to use the language of *Rahimi*, the relevant "principle[] that underpin[s] our regulatory tradition" against which *Heller* judged D.C.'s ban on handguns. 602 U.S. at 692.

Because only dangerous and unusual weapons can be banned, it follows that arms "in common use" are protected. *Heller*, 554 U.S. at 627. After all, an arm that is in common use cannot be dangerous and unusual. By definition, a common arm is not "unusual," and as a common arm cannot be "dangerous" compared to other common arms. And this is not just a matter of logic. Just like the permissible prohibitions on "dangerous and unusual weapons," the protection of arms "in common use" was also evidenced by our Nation's history, because normally "when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." *Id*. at 624 (brackets in original) (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)).

What *Heller* demonstrates, *Bruen* confirms. When the Court explained its framework, "common use" was the example it chose for how to use the "historical understanding of the Amendment to demark the limits on the exercise of th[e] right." 597 U.S. at 21. Once it was established that the arms at issue (handguns) were "'in common use' today for self-defense," there was no need for any further analysis of the type of arm at issue. *Id.* at 32. In distinguishing colonial laws that allegedly restricted the carrying of handguns, *Bruen* explained that regardless of what was true in colonial times, handguns are in common use today. *Id.* at 47. That was significant because "colonial legislatures sometimes prohibited the carrying of 'dangerous and unusual

weapons[,]' " and *in Heller*, "[d]rawing from this *historical tradition*, [the Court] explained there

that the Second Amendment protects only the carrying of weapons that are those 'in common use

at the time,' as opposed to those that 'are highly unusual in society at large.' " *Id.* (emphasis added).

If there were any doubt that *Heller*'s statements about "common use" were derived from history,

*Bruen* put them to rest.

> **b.  Oregon's Bans Target Arms That Are In Common Use For Lawful Purposes, So The Bans Must Fall.**

Plaintiffs have adequately alleged that Oregon's Bans target firearms that are in common

use for lawful purposes. Specifically, the First Amended Complaint details how Oregon's Bans

reach Plaintiffs' possession of common Glock-style semiautomatic handguns and AR-style

semiautomatic rifles, which are each indisputably in common use for lawful purposes throughout

the United States. FAC, ¶¶ 7–9, 31–39.

The State's misconception is revealed in its characterization of Plaintiffs' argument:

"According to plaintiffs' logic, because ghost guns **can also be** semiautomatic handguns and rifles

and because plaintiffs allege that semiautomatic handguns and rifles are commonly used for lawful

purposes, their claims . . . survive" the textual analysis. Br. at 6 (emphasis added). In fact,

Plaintiffs' "logic" is that the personally manufactured firearms at issue in this case **are**

semiautomatic handguns and rifles. FAC ¶¶ 7–9, 29–39. And there can be no dispute whatsoever

that such firearms are in common use. *See Heller*, 554 U.S. at 629 ("[H]andguns are the most

popular weapon chosen by Americans for self-defense in the home[.]"); *Bruen*, 591 U.S. at 47

(acknowledging that handguns "are unquestionably in common use today"); *Harrel v. Raoul*, 144

S. Ct. 2491, 2493 (2024) (Thomas, J.) (calling the AR-15 "America's most common civilian

rifle"); *Garland v. Cargill*, 602 U.S. 406, 430 (2024) (Sotomayor, J., dissenting) (referring to AR-

15 style rifles as "commonly available, semiautomatic rifles"); *Heller v. District of Columbia*, 670

F.3d 1244, 1287 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("The AR-15 is the most popular

semi-automatic rifle.").

No other type of firearm is at issue here. Even if the inquiry were (wrongly) restricted to whether home manufactured firearms are in common use, the answer is still plainly yes. According to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), approximately one million Americans own privately made firearms or "precursors"—the true number is likely much higher. Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652, 24,731 (Apr. 26, 2022) ("Frame or Receiver Rule"). As a result, there can be no question that the arms targeted by Oregon's Bans are in "common use." By comparison, as of 2012, "[h]undreds of thousands of Tasers and stun guns ha[d] been sold to private citizens" who "may lawfully possess them in 45 States." *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring) (citation omitted)). Just as those hundreds of thousands of stun guns were deemed by Justice Alito to constitute "common use" in *Caetano*, the millions of privately made firearms or "precursors" are sufficient to meet that standard here.

The State also wrongly assumes that common use must be alleged and proven as if it were an adjudicative fact subject to fact-finding under the rules of evidence. *Heller*, *Caetano*, and *Bruen* demonstrate otherwise. *Heller* reached the Supreme Court after the plaintiff's complaint had been dismissed. 554 U.S. at 576; *see Parker v. District of Columbia*, 311 F. Supp. 2d 103 (D.D.C. 2004). Instead of remanding the case for fact-finding on whether handguns were in common use, it simply recognized the obvious truth that they are and directed that judgment be entered for the plaintiff. *Caetano* involved a ban on stun guns. The Supreme Court's per curiam opinion assumed that stun guns were in common use, 577 U.S. at 411–12, and Justice Alito's concurrence concluded that stun guns "are widely owned and accepted as a legitimate means of self-defense across the country" by quoting a Michigan Court of Appeal's statement—supported in turn by citation to a law review article—that "hundreds of thousands" of them had been sold to private citizens, *id.* at 420 (citing *People v. Yanna*, 297 Mich. App. 137, 144 (2012)). In short, the common use question is properly decided as a legislative fact, not an adjudicative one. *See*, *e.g.*, *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) (citing Advisory Committee Note to Subdivision (a) of 1972 Proposed Rule of Evidence 201 in explaining that constitutionality of firearm legislation turned on

legislative facts rather than adjudicative facts); *Bianchi v. Brown*, 111 F.4th 438, 461 n.2 (4th Cir. 2024) (en banc) (exercising plenary review, following a motion to dismiss, of legislative facts relevant to the constitutionality of a ban on common semiautomatic firearms); *accord Bruen*, 597 U.S. at 33 n.8 (rejecting argument that a further evidentiary record was necessary to decide the Second Amendment question in reversing grant of motion to dismiss). And because this is a matter for the historical inquiry, Oregon bears the burden of proving that the regulated arms are "dangerous and unusual."

Finally, the State compounds its cart-before-the-horse mistake by arguing that "unserialized" or "undetectable" firearms "have no lawful purpose and are not, therefore, protected by the Second Amendment." Br. 8. To support this argument, Oregon points to cases upholding federal laws criminalizing the possession of firearms with obliterated serial numbers. Br. 8–9 (collecting criminal cases challenging 18 U.S.C. § 922(k)).

This logic is faulty. Privately made firearms such as the ones Plaintiffs identify in the First Amended Complaint—which have never had serial numbers—are not the same as firearms that have had their serial numbers removed. Plaintiffs lawfully manufactured their firearms without serial numbers and, contrary to § 922(k), federal law has never blocked the ability of law-abiding citizens to personally manufacture firearms for personal use. This is true whether the firearm is manufactured using an "unfinished frame or receiver", a 3D-printed frame or receiver, machined from a block of raw materials, or stamped from a piece of sheet metal. *See* ATF, *What is ATF doing in regards to people making their own firearms* (May 14, 2015), https://bit.ly/4a85mB0 ("An individual may generally make a firearm for personal use."); William J. Krouse, *Gun Control: 3D-Printed AR-15 Lower Receivers*, Cong. Res. Serv. Insight, 2 (Aug. 22, 2018), https://bit.ly/4a9lEcW ("In short, unfinished receivers and the components needed to build fully functional AR-15s and other firearms are legally available on the U.S. civilian gun market and can be purchased without a background check under federal law."); *see also*, *e.g.*, 18 U.S.C. § 922(a)(1)(a); Frame or Receiver Rule, 87 Fed. Reg. at 24,686–87 ("This rule does not restrict law-abiding citizens' ability to make their own firearms from parts for self-defense or other lawful

purposes."). Federal law also does not require "precursors" (such as "unfinished frames or receivers"), or the self-built firearms manufactured from them, to be serialized. Frame or Receiver Rule, 87 Fed. Reg. at 24,670 ("There are also no recordkeeping requirements imposed by the GCA [Gun Control Act] or the proposed or final rule upon unlicensed persons who make their own firearms, but only upon licensees who choose to take PMFs [Privately Made Firearms] into inventory.").

In short, Oregon's Bans target Plaintiffs' possession of semiautomatic handguns and semiautomatic rifles that are in common use for lawful purposes.

### c.    Oregon's Bans Are Inconsistent With Nation's Historical Tradition Of Firearms Regulation.

Oregon cannot meet its burden of "justify[ing] its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. As shown above, there is no tradition of banning firearms in common use. Indeed, the historical record reveals a rich tradition of self-manufacturing arms and possession of such arms.

Throughout American history, people have been free to personally manufacture, construct, and/or assemble arms for lawful purposes, including self-defense in the home. Manufacturing of firearms was not just common, it was also entirely unregulated during our Colonial and Founding Eras, and there were no restrictions on who could be a gunsmith or manufacture arms. *See, e.g.*, Letter from Sec'y of State Thomas Jefferson to George Hammond, British Ambassador to the U.S., (May 15, 1793), in 7 THE WRITINGS OF THOMAS JEFFERSON 325, 326 (Paul Ford ed., 1904) ("Our citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them."). "Since the earliest colonial days, Americans have been busily manufacturing and repairing arms." Joseph Greenlee, *The American Tradition of Self-Made Arms*, 54 ST. MARY'S L.J. 36 (2023). "Meanwhile, restrictions on self-made arms have been rare throughout American history." *Id.* In fact, "[a]ll restrictions on arms built for personal use have emerged within the last decade, and from only a few states." *Id.* And as noted above, the federal government has never blocked the ability of law-abiding citizens to self-manufacture firearms for

personal use. Indeed, regulations on self-manufactured arms are a distinctly modern phenomenon: "Regulations on self-built arms are not longstanding. In fact, there were no restrictions on the manufacture of arms for personal use in America during the seventeenth, eighteenth, or nineteenth centuries. All such restrictions have been enacted within the last decade [preceding 2023]." *Id.* at 78; *see id.* at 79–82 (collecting historical regulations on arms built for personal use).

The few historical regulations Oregon identifies a fail to serve as viable analogues to the State's bans Rule by falling short on the "how" and "why" metrics that are "central" to *Bruen*'s analogical analysis. For a historical law to serve as a "proper analogue" to a modern firearm regulation, the two laws must be "relevantly similar" based on "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *Id.* (citations omitted). To carry its burden, "the government [must] identify a well-established and representative" tradition of analogous regulation, and "courts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.'" *Id.* at 30 (citation omitted).

Oregon notes, for example, that some colonial laws imposed surveys of gun ownership and required members of the militia to submit their arms to inspection. Br. 12. But these laws were designed to ensure that militiamen were appropriately armed should they be called into service; they did not restrict colonial Americans' ability to manufacture arms, let alone ban any class of arms at all. If anything, these laws cut against Oregon, given the Bans prevent residents from possessing the precise types of arms that would be useful in militia service.

The State also cites a handful of late 19th century and early 20th century laws requiring firearms dealers to keep general sales records. Br. 12 & n.6. These regulations come too late in time to be probative of the scope of the Second Amendment. Appropriate historical analogues must stem from the Founding era, centering on 1791. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554 U.S. at 634–35;

*see also Bruen*, 597 U.S. at 34. Thus, "not all history is created equal," and courts must be careful not to overweigh historical evidence that long predates or postdates the Founding. *Bruen*, 597 U.S. at 34. In any event, these regulations have nothing in common with Oregon's Bans: They imposed no restriction at all on the private manufacture of firearms.

No history or precedent exists for extinguishing law-abiding citizens' ability to self-manufacture firearms for lawful purposes, or for prohibiting law-abiding citizens from possessing precursors to that end. To the contrary, the "principles that underpin [the Nation's] regulatory tradition," *Rahimi*, 602 U.S. at 692, establish that individuals must remain free to self-manufacture firearms for lawful purposes.

**B.      Summary Judgment—In Plaintiffs' Favor—Is Proper.**

Because this case involves no adjudicative facts, and consistent with the resolution of *Heller* and *Bruen*—where plaintiffs won their cases in the Supreme Court after having lost motions to dismiss in the district court—Plaintiffs agree that Defendants' motion may be treated as a motion for summary judgment, but judgment should be entered in favor of Plaintiffs for the reasons demonstrated above: (1) Oregon's Bans regulate conduct protected under the Second Amendment; and (2) Oregon cannot point to any relevant historical analogue to their modern gun control laws.

## V. CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss should be denied and summary judgment should be granted in Plaintiffs' favor.

Dated: December 6, 2024                    Respectfully submitted,

/s/ Leonard W. Williamson                  /s/ Stephen M. Duvernay
Leonard W. Williamson                      Bradley A. Benbrook*
Oregon State Bar No. 910020                Stephen M. Duvernay*
Van Ness Williamson LLP                    Benbrook Law Group, PC
l.williamson@vwllp.com                     brad@benbrooklawgroup.com
                                           steve@benbrooklawgroup.com

                                           *Pro hac vice
                                           Attorneys for Plaintiffs