Leonard W. Williamson, OSB #910020
LEONARD W. WILLIAMSON P.C.
1900 Hines Street SE, Suite 211
Salem, OR 97302
(503) 365-8800
l.williamson@williamsonlawpc.com

Bradley A. Benbrook*
Stephen M. Duvernay*
BENBROOK LAW GROUP, PC
701 University Avenue, Suite 106
Sacramento, California  95825
Telephone: (916) 447-4900
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

*Pro hac vice

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

|  |  |
|---|---|
| DALLIN MONTGOMERY; NICK HOLDWAY; KEVIN WALTERS; OREGON FIREARMS FEDERATION; and FIREARMS POLICY COALITION, INC., | Case No.:  3:24-cv-01273-AN |
|      Plaintiffs, | **SECOND AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, OR OTHER RELIEF** |
|  v. |  |
| ELLEN ROSENBLUM, in her Official Capacity as Oregon Attorney General; and CASEY CODDING, in his Official Capacity as Superintendent of the Oregon State Police, |  |
|      Defendants. |  |

COME NOW Plaintiffs Dallin Montgomery, Nick Holdway, Kevin Walters (collectively the "Individual Plaintiffs"), Oregon Firearms Federation, and Firearms Policy Coalition, Inc. (collectively the "Organizational Plaintiffs") (altogether the "Plaintiffs"), by and through undersigned counsel, and allege as follows:

## INTRODUCTION

1.    Throughout American history, people have been free to acquire tools, materials, and information, and then make their own arms, including firearms, for lawful purposes.

2.    In defiance of this historical tradition, Oregon enacted House Bill 2005 ("HB 2005") that—effective September 1, 2024—unconstitutionally prohibits individuals from (a) making their own personally manufactured firearms ("PMFs"), (b) acquiring some precursor parts necessary to the construction of PMFs, and (c) possessing and using PMFs for lawful purposes in violation of the right to keep and bear arms protected under the Second and Fourteenth Amendments. As enacted in HB 2005, ORS § 166.265(1)(a), (2)(a) prohibits the manufacture or possession of an "undetectable" firearm; ORS § 166.266(1) prohibits the possession of an unserialized firearm; and ORS 166.267(2)(a) prohibits the "knowing[] possession" of an unfinished frame or receiver. Collectively, these statutes and Defendants' enforcement of them are referred to as "Oregon's Ban."

3.    Plaintiffs thus seek to vindicate their rights and permanently enjoin enforcement of Oregon's Ban.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over this matter under 28 U.S.C. § 1331 and 28 U.S.C. § 1343, because this Complaint seeks relief afforded by 42 U.S.C. § 1983, for past, continuing, and/or imminent violations of Plaintiffs' rights arising under the United States Constitution.

5.    Venue is proper under 28 U.S.C. § 1391.

## THE PARTIES

6.    Plaintiff Dallin Montgomery is an Oregon citizen residing in Clackamas County. Plaintiff Montgomery is a member of FPC and OFF. Plaintiff Montgomery is a law-abiding,

responsible person who holds an Oregon concealed carry permit issued by the Clackamas County Sheriff's Office and is not prohibited from possessing or purchasing firearms under federal or state law.

7.    Plaintiff Nick Holdway is an Oregon citizen residing in Lane County. Plaintiff Holdway is a member of FPC and OFF. Plaintiff Holdway is a law-abiding, responsible person who holds an Oregon concealed carry permit issued by the Lane County Sheriff's Office and is not prohibited from possessing or purchasing firearms under federal or state law.

8.    Plaintiff Kevin Walters is an Oregon citizen residing in Lane County. Plaintiff Walters is a member of FPC and OFF. Plaintiff Walters is a law-abiding, responsible person who holds an Oregon concealed carry permit issued by the Lane County Sheriff's Office and is not prohibited from possessing or purchasing firearms under federal or state law.

9.    Plaintiff Firearms Policy Coalition, Inc. is a 501(c)(4) nonprofit membership organization incorporated in Delaware with a primary place of business in Clark County, Nevada. Plaintiff FPC works to create a world of maximal human liberty and freedom and to promote and protect individual liberty, private property, and economic freedoms. Plaintiff FPC seeks to protect, defend, and advance the People's rights, especially but not limited to the inalienable, fundamental, and individual right to keep and bear arms and protect the means by which individuals may exercise the right to carry and use firearms. Plaintiff FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs. Plaintiff FPC's members reside both within and outside Oregon. Plaintiff FPC's members are adversely and directly harmed by Defendants' enforcement of the laws, regulations, policies, practices, and customs challenged herein. Plaintiff FPC brings this action on behalf of its members.

10.    Plaintiff OFF is an Oregon public benefit corporation located in Canby, Clackamas County, Oregon. Plaintiff OFF is qualified as tax-exempt under 26 U.S.C. §501(c)(4). Plaintiff OFF seeks to defend the civil rights of all law-abiding individuals in Oregon including the fundamental right to build and acquire additional arms for personal use. Plaintiff OFF's members

are adversely and directly harmed by Defendants' enforcement of the laws, regulations, policies, practices, and customs challenged herein. Plaintiff OFF brings this action on behalf of its members.

11.     Defendant Ellen Rosenblum is sued in her official capacity as Attorney General of the State of Oregon. As Attorney General, Defendant Rosenblum has the power to "advise and direct the district attorneys in all criminal causes and matters relating to state affairs in their respective counties" including in any prosecutions for violations of the laws challenged herein. ORS 180.060(5).

12.     Defendant Casey Codding is sued in his official capacity as Superintendent of the Oregon State Police. As Superintendent, Defendant Codding oversees the state police force which has the power to enforce all criminal laws, including the laws challenged herein, throughout the state. ORS 181A.080.

## GENERAL ALLEGATIONS

13.     In 2023, Oregon enacted HB 2005, which in relevant part effectively bans the sale and possession of constitutionally protected personally manufactured firearms and certain precursor parts and materials necessary to personally manufacture constitutionally protected firearms.

14.     HB 2005 includes the following definitions:

"Undetectable firearm" means a firearm:
(a) Constructed or produced, including through a three-dimensional printing process, entirely of nonmetal substances;
(b) That, after removal of grips, stocks and magazines, is not as detectable as a security exemplar by a walk-through metal detector calibrated to detect the security exemplar; or
(c) That includes a major component that, if subjected to inspection by the types of X-ray machines commonly used at airports, would not generate an image that accurately depicts the shape of the component.

"Unfinished frame or receiver" means a forging, casting, printing, extrusion, machined body or similar item that:
(A) Is designed to or may readily be completed, assembled or otherwise converted to function as a frame or receiver; or

(B) Is marketed or sold to the public to be completed, assembled or otherwise converted to function as a frame or receiver.

HB 2005-C, § 1, enacted at ORS § 166.210(17) & (18).

15.    Oregon's Ban makes it a felony to manufacture, import, offer for sale, sell, or transfer an undetectable firearm, and makes possession of an undetectable firearm a misdemeanor. HB 2005-C, § 3, enacted at ORS § 166.265.

16.    Oregon's Ban also makes it a crime to offer for sale, sell, transfer, or possess an unserialized firearm. HB 2005-C, § 4, enacted at ORS § 166.266.[1]

17.    Oregon's Ban generally criminalizes importation, offering for sale, sale, transfer, and possession of an "unfinished frame or receiver." HB 2005-C, § 5, enacted at ORS § 166.267.

18.    An "unfinished frame or receiver," while not itself a firearm, may be used in the manufacture of a firearm.[2]

19.    Put simply, Oregon's Ban makes it a crime to sell, transfer, or possess an unfinished frame or receiver that lacks a serial number.

20.    Oregon's Ban took effect on September 1, 2024.

21.    Before Oregon's Ban went into effect, Plaintiff Montgomery possessed an unserialized Glock-style semiautomatic handgun he lawfully personally manufactured from a polymer precursor. This immediately subjected him to Oregon's Ban.

22.    But for Defendants' enforcement of Oregon's Ban and the threat of criminal sanctions, Plaintiff Montgomery would continue to possess the personally manufactured arms and items he did before HB 2005 took effect.

---

[1] This prohibition does not reach firearms manufactured prior to October 22, 1968, when the federal Gun Control Act was enacted by Congress. ORS § 166.266(2)(b). Based on contemporary reports, this includes over 90 million (and perhaps up to 200 million) firearms that were in civilian hands at the time. *See* Nat'l Comm'n on the Causes and Prevention of Violence, *Firearms & Violence in American Life* xi, 3–7 (1969).

[2] The two principal exceptions to this ban, not applicable here, are to: (1) allow a firearms dealer to sell an unfinished frame or receiver that has been serialized, subject to the recordkeeping requirements that apply to all firearm sales; and (2) permit manufacturers to possess an unfinished frame or receiver that will be serialized as part of the manufacturing process. HB 2005-C, § 5, enacted at ORS § 166.267(1)(a), (2)(a).

23. But for Defendants' enforcement of Oregon's Ban and the threat of criminal sanctions, Plaintiff Montgomery would purchase banned items on the Internet through out-of-state retailers for shipment into Oregon for use in personally manufacturing constitutionally protected firearms; personally manufacture constitutionally protected firearms; and possess and use those precursor items and personally manufactured firearms for lawful purposes including but not limited to self-defense.

24. Before Oregon's Ban went into effect, Plaintiff Holdway possessed multiple items that were banned by HB 2005 including: an unserialized Glock-style semiautomatic pistol built from a polymer frame; an unserialized Glock-style polymer frame for a semiautomatic handgun; an unserialized AR-platform semiautomatic rifle built from an "unfinished frame or receiver"; and an unserialized "unfinished frame or receiver" that he would manufacture into the receiver for an AR-platform rifle. This immediately subjected him to Oregon's Ban.

25. But for Defendants' enforcement of Oregon's Ban and the threat of criminal sanctions, Plaintiff Holdway would continue to possess the personally manufactured arms and items he did before HB 2005 took effect.

26. But for Defendants' enforcement of Oregon's Ban and the threat of criminal sanctions, Plaintiff Holdway would purchase banned items on the Internet through out-of-state retailers for shipment into Oregon for use in personally manufacturing constitutionally protected firearms; personally manufacture constitutionally protected firearms; and possess and use those precursor items and personally manufactured firearms for lawful purposes including but not limited to self-defense.

27. Before Oregon's Ban went into effect, Plaintiff Walters possessed multiple items that fall within Oregon's Ban including frames for three Glock-style semiautomatic handguns he personally manufactured using a 3D printer and PLA+ filament. This immediately subjected him to Oregon's Ban.

**Deleted:** FIRST

28.    But for Defendants' enforcement of Oregon's Ban and the threat of criminal sanctions, Plaintiff Walters would continue to possess the personally manufactured arms and items he did before HB 2005 took effect.

29.    But for Defendants' enforcement of Oregon's Ban and the threat of criminal sanctions, Plaintiff Walters would purchase banned items on the Internet through out-of-state retailers for shipment into Oregon for use in personally manufacturing constitutionally protected firearms; personally manufacture constitutionally protected firearms; and possess and use those precursor items and personally manufactured firearms for lawful purposes including but not limited to self-defense.

30.    But for Defendants' enforcement of Oregon's Ban and the threat of criminal sanctions, Plaintiffs would acquire precursor parts and personally manufacture and use for lawful purposes constitutionally protected firearms including but not limited to single-shot, bolt action, manually repeating, and semiautomatic handguns, rifles, including but not limited to AR-15-platform rifles, and shotguns.

31.    Defendants' enforcement of Oregon's Ban has and will continue to violate Plaintiffs' right to keep and bear arms protected under the Second and Fourteenth Amendments and inflict irreparable harm upon them.

### CLAIM FOR RELIEF
### VIOLATION OF 42 U.S.C. § 1983
### (SECOND AND FOURTEENTH AMENDMENTS)

32.    Plaintiffs incorporate here by reference paragraphs 1 through 31, *supra*, as if fully set forth herein.

33.    The Second Amendment to the U.S. Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. AMEND. II.

34.    The Second Amendment guarantees "an individual right to keep and bear arms," which is "a fundamental constitutional right guaranteed to the people." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008).

35.    The Second Amendment is applicable to the States through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010); *id*. at 805 (Thomas, J., concurring).

36.    And "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634.

37.    When, as here, "the Second Amendment's plain text covers an individual's conduct"—manufacturing arms, possessing the materials necessary to do so, and ultimately keeping and bearing such personally manufactured arms—"the Constitution presumptively protects that conduct. To justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022).

38.    Oregon cannot meet its burden to justify its laws challenged here because they run directly counter to the Nation's historical tradition of firearm regulation.

39.    The Second Amendment protects ancillary rights that are necessary to the exercise of the individual right to "possess a firearm for self-defense" including "'the ability to acquire arms.'" *Teixeira v. County of Alameda*, 873 F.3d 670, 677–78 (9th Cir. 2017) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)); *Drummond v. Robinson Township*, 9 F.4th 217, 227 (3d Cir. 2021) (the Second Amendment "'implies a corresponding right to acquire and maintain proficiency' with common weapons (quoting *Ezell*)).

40.    Certainly nothing within the plain text of the Second Amendment limits the manner of arms acquisition—*i.e.*, limiting it to the purchase or acquisition from a third party. *See Teixeira*, 873 F.3d at 679 (the right "to keep" arms "necessarily involves" the right to "'keep them in a state

of efficiency for use'" and "'to keep them in repair,'" which implies the right to self-repair (quoting *Andrews v. State*, 50 Tenn. 165, 178 (1871))).

41.    These principles confirm that Plaintiffs' proposed course of conduct—to personally manufacture arms, possess the materials necessary to do so, and to keep and bear personally manufactured arms—is covered by the Second Amendment's text.

42.    The right to personally manufacture "wouldn't mean much" without the right to own, possess, and use the items and materials necessary to engage in such activity—and, of course, the firearms ultimately produced, so long as such firearms are themselves protected by the Second Amendment and not subject to prohibition. *See Teixeira v. Cnty. Of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011).

43.    As one district court has explained,

> [T]he right to keep and bear arms implies a corresponding right to manufacture arms. Indeed, the right to keep and bear arms would be meaningless if no individual or entity could manufacture a firearm. Thus, if possessing untraceable firearms is protected by the Second Amendment, then so too is manufacturing them.

*Rigby v. Jennings*, 630 F. Supp. 3d 602, 615 (D. Del. 2022).

44.    Apart from just the right to personally manufacture firearms, Oregon's Ban also unconstitutionally infringes the right of ordinary Oregonians to possess constitutionally protected arms.

45.    It is clear that "the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'" *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 627). *Heller* and *Bruen* establish the historical rule of decision for all arms-ban cases: arms that are "in common use" are absolutely protected and cannot be banned, a conclusion that is "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *See Heller*, 554 U.S. at 627.

**Formatted:** Font: +Headings CS (Times New Roman)

**Formatted:** Font: +Headings CS (Times New Roman)

**Formatted:** Indent: Left:  1", Right:  1"

**Deleted:** the Bans

**Formatted:** Font: +Headings CS (Times New Roman)

**Deleted:** infringe

**Formatted:** Font: +Headings CS (Times New Roman)

**Deleted:** And because

**Deleted:** FIRST

46.    Because the firearms subject to the Oregon's Ban are "arms" "in common use" for lawful purposes, they are presumptively protected by the Second Amendment's "'unqualified command.'" *Bruen*, 597 U.S. at 17 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10).

47.    Single-shot, bolt action, manually repeating, and semiautomatic handguns, rifles, and shotguns are constitutionally protected arms that are in common use for lawful purposes.

48.    Oregon's Ban goes so far as to prohibit Plaintiffs' self-manufacture, possession, and lawful use of common Glock-style semiautomatic handguns and AR-style semiautomatic rifles, which are each indisputably in common use for lawful purposes throughout the United States.

49.    In *Heller*, the Supreme Court recognized that "handguns are the most popular weapon chosen by Americans for self-defense in the home"); *accord Bruen*, 591 U.S. at 47 (acknowledging that handguns "are unquestionably in common use today").

50.    *Heller* and *Bruen* thus demonstrate that the "common use" determination occurs at the broad category level—here, for example, handguns, rifles, and shotguns.

51.    Glock handguns are among the most popular models of semi-automatic pistols sold in the Nation. *See, e.g.*, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), *2022 Annual Firearms Manufacturers and Export Report* (June 2024) (Glock produced 465,117 pistols in 2022); ATF, *2021 Annual Firearms Manufacturers and Export Report* (January 2023) (Glock produced 581,944 pistols in 2021);[3] Gun Genius, Top 10 Handguns of 2023, https://www.gungenius.com/top-selling/guns/top-10-handguns-of-2023/ (identifying Glock G19 and G43 as two of the top five handgun models sold in 2023); Guy J. Sagi, *Glock G19: A Top-*

---

[3] ATF data suggests that, in addition to these domestic manufacturing numbers, Glock imports a significant number of firearms into the United States from Austria. *See, e.g.*, ATF, *Firearms Commerce in the United States, Annual Statistical Update 2021* 9 (1.279 million handguns imported from Austria in 2020); ATF, *Firearms Commerce in the United States, Annual Statistical Update 2019* 9 (811,574 handguns imported from Austria in 2019); ATF, *Firearms Commerce in the United States, Annual Statistical Update 2020* 9 (927,524 handguns imported from Austria in 2018). ATF data does not include the number of firearms that are personally manufactured for personal use in the United States, further adding to the total number of the arms.

*Selling Pistol in 2020*, American Rifleman (Jan. 20, 2021) (identifying the Glock G19 as "the top-selling semi-auto pistol sold by FFLs using the services of GunBroker.com" in 2020).[4]

52.    Rifles built on an "AR-style" platform are a paradigmatic example of the type of arm Plaintiffs desire to personally manufacture.

53.    "AR" is short for ArmaLite Rifle; ArmaLite originally designed the platform.

54.    Semiautomatic rifles are so common that the Supreme Court unanimously recognized the AR-15 rifle as "the most popular rifle" in America. *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 297 (2025). *See also Harrel v. Raoul*, 144 S. Ct. 2491, 2493 (2024) (Thomas, J.) (calling the AR-15 "America's most common civilian rifle"); *Garland v. Cargill*, 602 U.S. 406, 430 (2024) (Sotomayor, J., dissenting) (referring to AR-15 style rifles as "commonly available, semiautomatic rifles"); *Heller v. District of Columbia*, 670 F.3d 1244, 1287 (D.C. Cir. 2011) ("Heller II") (Kavanaugh, J., dissenting) ("The AR-15 is the most popular semi-automatic rifle."); ATF, *Definition of 'Frame or Receiver' and Identification of Firearms*, 87 Fed. Reg. 24,652-01, 24,652, 24,655 (Apr. 26, 2022) (describing the AR-15 as "one of the most popular firearms in the United States" for "civilian use").

55.    Semiautomatic rifles "traditionally have been widely accepted as lawful possessions," *see Staples v. United States*, 511 U.S. 600, 612 (1994) (so categorizing an AR-15 semiautomatic rifle), and they are in common use, *see Heller II*, 670 F. 3d at 1261 ("We think it clear enough in the record that semi-automatic rifles … are indeed in 'common use' as the plaintiffs contend.").

56.    AR-15 rifles are among the most popular firearms in the nation, and they are owned by millions of Americans.

57.    A recent survey of gun owners indicates that about 24.6 million Americans have owned AR-15 or similar modern semiautomatic rifles, with the "median owner" identified as

---

[4] Data from the National Shooting Sports Foundation (NSSF) further confirms that semiautomatic pistols are the most popular category of firearm sold in the United States. NSSF, *2021 Firearms Retailer Survey Report* at 9 (2021) (semi-automatic pistols accounted for 43.5% of all firearm sales in 2018 and 44.2% of sales in 2020).

owning a single rifle. English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 2, 33 (May 13, 2022), https://bit.ly/3yPfoHw.

58.    A recent industry publication similarly estimated that over 24 million AR-15 or similar rifles have been produced for the U.S. market. Nat'l Shooting Sports Found., Inc., *Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation* (July 20,2022), https://bit.ly/3QBXiyv.

59.    Approximately 20% of all firearms sold in recent years were rifles of the type Plaintiffs wish to personally manufacture. Nat'l Shooting Sports Found., Inc., *Firearms Retailer Survey Report 2021* at 9, available at https://bit.ly/3gWhI8E.

60.    In 2020, more than 20 million adults participated in target or sport shooting with semiautomatic rifles like those Plaintiffs wish to personally manufacture. Nat'l Shooting Sports Found., Inc., *Sport Shooting Participation in the U.S. in 2020* at iii, available at https://bit.ly/3sPuEQl (last accessed Jan. 12, 2023).

61.    Semiautomatic firearms fire only one round for each pull of the trigger. They are not machine guns. *Staples*, 511 U.S. at 620 n.1.

62.    A semiautomatic firearm can only fire as often as a person can pull its trigger.

63.    Central among the lawful and common uses of semiautomatic firearms Plaintiffs wish to personally manufacture is self-defense. A majority of owners of AR-style rifles said that they owned their firearms for self-defense. English, *2021 National Firearms Survey, supra*, at 34 (61.9% owned for home defense; 34.6% owned for defense outside the home).

64.    Owners of AR-15s and other similar rifles rated "Home/self-defense" as over 8 out of 10 in importance for owning them, the second-highest rating after recreational target shooting. Nat'l Shooting Sports Found., Inc., *Modern Sporting Rifle: Comprehensive Consumer Report* 18 (July 14, 2022), available athttps://bit.ly/3SSrVjM.

65.    An AR-15 rifle is an optimal firearm to rely on in a self-defense encounter. Most AR-style firearms are chambered for 5.56x45mm NATO, which is similar to .223 Remington ammunition.

**Deleted:** FIRST

66.    5.56x45mm NATO is a relatively inexpensive and common cartridge that is particularly well suited for home-defense purposes because it has sufficient stopping power in the event of a home intrusion, but quickly loses velocity after passing through a target and other objects, thus decreasing the chance that an errant shot will strike an unintended target.

67.    Although most pistol rounds have less muzzle velocity than a 5.56x45mm NATO round, they have greater mass, maintain velocity after passing through walls and other objects, and pose substantially greater risks to unintended targets in, or even outside, the home.

68.    Most common semiautomatic rifles, including those Plaintiffs wish to personally manufacture, can accept a detachable magazine.

69.    Detachable magazines not only assist law-abiding shooters in reloading their firearm in stressful defense circumstances, but in the case of some platforms, including the common AR-15, they are required to safely and quickly remedy malfunctions.

70.    Encounters with criminal intruders in the home, where the AR-style rifle may be most useful, are not uncommon.

71.    According to a report by the U.S. Department of Justice, Bureau of Justice Statistics, household members are present for almost a third of all burglaries and become victims of violent crimes in more than a quarter of those cases.

72.    Studies on the frequency of defensive gun uses in the United States have determined that there are up to 2.5million instances each year in which civilians use firearms to defend themselves or their property. Kleck & Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. OF CRIM. L. & CRIMINOLOGY 150, 164 (1995); *see also* English, *National Firearms Survey, supra* at 9 (finding 31.1% of firearms owners, or approximately 25.3 million adult Americans, have used a firearm in self-defense and there are 1.67 million defensive firearm uses a year).

73.    Both Kleck & Gertz and English found that over 100,000 of these annual defensive gun uses were with rifles. *See* Kleck & Gertz, *Armed Resistance to Crime, supra*, at 185; English, *2021 National Firearms Survey, supra*, at 11.

Deleted: FIRST

74.    Other common, lawful uses of the firearms Plaintiffs wish to personally manufacture are hunting, training, target shooting, and sport.

75.    At least a third of all gun-owners use a firearm for hunting or sport shooting, and recreational target shooting is a top reason for owning semiautomatic firearms.

76.    In recent years, the AR-platform has been "the best-selling rifle type in the United States." Johnson, *Supply Restrictions at the Margins of* Heller *and the Abortion Analogue: Stenberg Principles, Assault Weapons, and the Attitudinalist Critique*, 60 HASTINGS L.J. 1285, 1296 (2009).

77.    Today, the number of semiautomatic rifles in circulation in the United States exceeds twenty-four million. NSSF, *Commonly Owned: NSSF Announces Over 24 Million MSRS in Circulation* (July 20, 2022).

78.    As a category, semiautomatic rifles represent the second-most common type of firearm sold, at approximately 20% of all firearm sales, behind only semiautomatic handguns. *2021 Firearms Retailer Survey Report*, *supra*, at 9.

79.    The very fact that such rifles are so ubiquitous demonstrates they are owned for lawful purposes.

80.    In 2022, Washington Post-Ipsos conducted a survey of a random sample of 2,104 gun owners. *Poll of current gun owners* at 1, Wash. Post-Ipsos (2022), https://perma.cc/YSJ5-STNS ("Wash-Post Poll").

81.    The Wash-Post Poll asked whether individuals owned AR-15-style semiautomatic rifles. Twenty percent answered yes, *id.*, which indicates that "about 16 million Americans own an AR-15." Guskin, et al., *Why do Americans own AR-15s?*, Wash. Post (Mar. 27, 2023), https://wapo.st/3IDZG5I.

82.    The Wash-Post Poll also asked why individuals owned AR-15s. Reasons given included: protecting self, family and property (91%, with 65% stating this was a major reason), target shooting (90%), in case law and order breaks down (74%), and hunting (48%). WashPost

Poll at 1–2. Sixty-two percent of AR-15 owners reported firing their AR-15 rifles at least a few times a year. *Id.* at 2.

83.    A 2021 NSSF survey of 2,185 owners of AR- and AK-platform rifles yielded similar results. NSSF, *Modern Sporting Rifle: Comprehensive Consumer Report* at 10 (July 14, 2022), https://perma.cc/TAY2-CG2X.

84.    For the 2021 NSSF survey, gun owners were asked to rate on a scale of 1 to 10 (with 1 being not at all important and 10 very important) how important various reasons for owning the rifles. Responses included recreational target shooting (8.7), home/self-defense (8.3), and varmint hunting (5.8). *Id.* at 18. Sixty-seven percent of respondents indicated that they had used their rifle at least five times in the previous twelve months. *Id.* at 41.

85.    Another NSSF survey estimated that over 21 million Americans had trained with semiautomatic rifles in 2020. NSSF, *Sport Shooting Participation in the U.S. in 2020* at iii (2021), https://perma.cc/P549-STFN.

86.    That Plaintiffs seek to possess arms that are privately made—and not commercially manufactured—does not change the analysis. "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582; *see also Bruen*, 597 U.S. at 28 ("even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense").

87.    Put simply, the Second Amendment's plain text does not distinguish among bearable arms.

88.    Oregon bans the possession of privately made arms and the precursors (*i.e.*, "unfinished frame[s] or receiver[s]") necessary to manufacture them. Specifically, ORS § 166.266(1) provides that "[a] person may not knowingly possess, offer for sale, sell or transfer a firearm unless the firearm has been imprinted with a serial number by a federally licensed firearm manufacturer, importer or dealer, or a gunsmith with a federal firearms license, in accordance with federal law."

89.     The statute provides no means for individuals who possess unserialized firearms to get them serialized. As this Court has recognized, "[i]f a serial number can only be applied by a federally licensed entity, and it is unlawful to possess for any period of time a firearm that does not have a serial number unless you are a federally licensed entity or gunsmith, it is unclear how an unlicensed individual could personally manufacture a lawful firearm on their own." ECF No. 46, Opinion and Order on Motion to Dismiss, at 9.

90.     As to precursors, ORS § 166.266(2)(a) provides that "[a] person may not knowingly possess an unfinished frame or receiver that is not serialized" unless they are "a federally licensed gun manufacturer" and "[t]he unfinished frame or receiver is an unfinished part within a manufacturing process that includes serialization."

91.     Thus, individuals (like Plaintiffs) who are not federally licensed gun manufacturers are subject to an absolute prohibition. The net effect is that non-licensed individuals cannot personally manufacture arms using an unserialized frame or receiver, since the frame or receiver is "a key building block of almost any firearm." *Bondi v. VanDerStok*, 604 U.S. 458, 465 (2025).

92.     These provisions effect a total ban on the possession of privately made firearms because Oregon provides no method for individuals to either serialize their self-made firearms or otherwise comply with Oregon's Ban.

93.     This contrasts with the approach taken by other States; California and Connecticut, for example, do not prohibit unserialized self-manufactured firearms outright but instead require individuals to obtain serial numbers for their self-manufactured firearms from state authorities. Cal. Penal Code § 29180 (b)(1); Conn. Gen. State § 29-36a.

94.     HB 2005 also prohibits both the "manufacture" and "knowing[] possession" of "undetectable" firearms, which includes firearms "constructed or produced" from "entirely … nonmetal substances." ORS §§ 166.265, 166.210(17)(a). This flat ban prevents individuals from privately manufacturing firearms by 3D printing using polymer (such as PLA+ filament, which is a "nonmetal substance[]").

| Deleted: FIRST |
|---|

95.     The ban also appears to reach not only firearms that are made "entirely of nonmetal substances," but also firearms where any "major component"—like a frame or receiver—is made of nonmetal substances. *See* ORS § 166.210(17)(c).[5] This prohibition effectively prevents individuals from using 3D-printing or similar processes to self-manufacture firearms, since it (1) explicitly applies to any firearm that is "entirely" 3D-printed, and (2) arguably applies to a firearm where any of the "major components" (barrel, slide or cylinder, or frame or receiver) are 3D-printed to the extent that the shape of such components are not "accurately depict[ed]" by common airport X-ray machines. *See supra*, n. 5.

96.     Oregon's Ban applies across-the-board to reach all firearms, including single-shot, bolt-action, manually repeating, and semiautomatic firearms.

97.     Plaintiffs' proposed course of conduct—to keep and bear personally manufactured arms, and acquire and possess the items necessary to do so—is covered by the Second Amendment's text.

98.     Because Oregon's Ban targets conduct that falls within the Second Amendment's plain text, the State must therefore "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

99.     It is the government's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19 (cleaned up); *see also id.* at 60 ("[W]e are not obliged to sift the historical materials for evidence to sustain [the State's] statute. That is respondents' burden."). But Defendants cannot do so.

100.     There is a rich tradition throughout the Nation's history in favor of self-built arms.

---

[5] Specifically, the statutory definition of "undetectable firearm" also includes a firearm "[t]hat includes a major component that, if subjected to inspection by the types of X-ray machines commonly used at airports, would not generate an image that accurately depicts the shape of the component." ORS § 166.210(17)(c). "Major component" is defined by reference to 18 U.S.C. § 922, which identifies "the barrel, the slide or cylinder, or the frame or receiver of the firearm." ORS § 166.210(8); 18 U.S.C. § 922(a)(2)(B). Plaintiffs do not know whether common X-ray machines "accurately depict[]" the shape of 3D-printed components.

101.    Throughout American history, people have been free to personally manufacture, construct, and/or assemble arms for lawful purposes, including self-defense in the home. Manufacturing of firearms was not just common, but was entirely unregulated during our Colonial and Founding Eras, and there were no restrictions on who could be a gunsmith or manufacture arms. *See, e.g., Letter from Sec'y of State Thomas Jefferson to George Hammond, British Ambassador to the U.S.*, (May 15, 1793), in 7 THE WRITINGS OF THOMAS JEFFERSON 325, 326 (Paul Ford ed., 1904) ("Our citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them.").

102.    "Since the earliest colonial days, Americans have been busily manufacturing and repairing arms." Joseph Greenlee, *The American Tradition of Self-Made Arms*, 54 ST. MARY'S L.J. 36 (2023). "Meanwhile, restrictions on self-made arms have been rare throughout American history." *Id.* In fact, "[a]ll restrictions on arms built for personal use have emerged within the last decade, and from only a few states." *Id.*

103.    And the federal government, for all of its recent efforts at expanding firearm regulations, has never blocked the ability of law-abiding citizens to personally manufacture firearms for personal use.

104.    This is true even if the firearm is built using an unfinished frame or receiver, a 3D-printed frame or receiver, machined from a block of raw materials, or stamped from a piece of sheet metal. *See* Bureau Of Alcohol, Tobacco, Firearms, and Explosives, *What is ATF doing in regards to people making their own firearms* (May 14, 2015), https://bit.ly/4a85mB0 ("An individual may generally make a firearm for personal use."); William J. Krouse, *Gun Control: 3D-Printed AR-15 Lower Receivers*, Cong. Res. Serv. Insight, 2 (Aug. 22, 2018), https://bit.ly/4a9lEcW ("In short, unfinished receivers and the components needed to build fully functional AR-15s and other firearms are legally available on the U.S. civilian gun market and can be purchased without a background check under federal law."); *see also, e.g.*, 18 U.S.C. § 922(a)(1)(a); Final Rule, Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24652, 24686–87 (April 26, 2022) (effective August 24, 2022) ("This rule does not restrict

Deleted: FIRST

law-abiding citizens' ability to make their own firearms from parts for self-defense or other lawful purposes.").

105.    Federal law also does not require precursors (such as "unfinished frames or receivers"), or the self-built firearms manufactured from them, to be serialized. 87 Fed. Reg. at 24670 ("There are also no recordkeeping requirements imposed by the GCA [Gun Control Act] or the proposed or final rule upon unlicensed persons who make their own firearms, but only upon licensees who choose to take PMFs [Privately Made Firearms] into inventory.").

106.    Federal law only requires that "[l]icensed importers and licensed manufacturers shall identify by means of a serial number engraved or cast on the receiver or frame of the weapon . . . each firearm imported or manufactured by such importer or manufacturer." 18 U.S.C. § 923(i); *see also* 27 C.F.R. §§ 478.92 (similar, and also requiring federal firearms licensees to mark and record PMFs when they are received or acquired into inventory).

107.    No history or precedent exists for extinguishing law-abiding citizens' ability to personally manufacture firearms for lawful purposes, or for prohibiting law-abiding citizens from possessing precursors to that end.

108.    To the contrary, the "principles that underpin the Nation's regulatory tradition," *United States v. Rahimi*, 602 U.S. 680, 692 (2024), establish that individuals must remain free to personally manufacture firearms for lawful purposes.

109.    The Second Amendment's text as informed by constitutionally relevant history firmly establishes the right to personally manufacture firearms and to possess and use the items and materials necessary to construct such arms for lawful purposes.

110.    Because Plaintiffs' proposed course of conduct is covered by the Second Amendment's plain text, it the Constitution "presumptively protects" their conduct. *Bruen*, 597 U.S. at 24.

111.    It is thus the State's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."

*Id.* at 19; *see also id.* at 60 ("[W]e are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden.").

112.    Oregon cannot meet this burden. There is no well-established and representative historical tradition of banning arms that are in common use for lawful purposes or banning the personal manufacture of such arms.

113.    Accordingly, HB 2005's prohibitions on the sale, transfer, and possession of personally manufactured firearms and precursors violate the Second and Fourteenth Amendments.

114.    Plaintiffs bring this challenge because they unquestionably face "a realistic danger of sustaining a direct injury as a result of the law's operation or enforcement." *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 747 (9th Cir. 2020).

115.    Oregon's Ban, and Defendants' enforcement thereof, inflicts irreparable harm on Plaintiffs by infringing on their constitutionally protected right to keep and bear arms.

116.    Plaintiffs lack an adequate remedy at law for this constitutional violation and, therefore, injunctive relief is appropriate.

117.    For the reasons set forth above, Oregon's Ban violates the Second and Fourteenth Amendments.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request:

1.    That this Court issue a declaratory judgment that ORS § 166.265(1)(a), (2)(a) (prohibiting the manufacture or possession of an "undetectable" firearm) is unconstitutional, facially and as-applied, under the Second and Fourteenth Amendments to the United States Constitution.

2.    That this Court issue a declaratory judgment that ORS § 166.266(1) (prohibiting the possession of an unserialized firearm) is unconstitutional, facially and as-applied, under the Second and Fourteenth Amendments to the United States Constitution.

3.    That this Court issue a declaratory judgment that ORS 166.267(2)(a) (prohibiting the "knowing[] possession" of an unfinished frame or receiver) is unconstitutional, facially and as-applied, under the Second and Fourteenth Amendments to the United States Constitution.

4.    That this Court issue a permanent injunction enjoining Defendants, Defendants' officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with Defendants, from enforcing ORS § 166.265(1)(a), (2)(a) (prohibiting the manufacture or possession of an "undetectable" firearm); ORS § 166.266(1) (prohibiting the possession of an unserialized firearm); and ORS 166.267(2)(a) (prohibiting the "knowing[] possession" of an unfinished frame or receiver).

5.    That this Court award costs of suit, including reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and any other applicable law.

6.    That this Court award any and all further relief necessary to enforce the Court's judgment.

7.    That this Court award any and all further relief to which Plaintiffs may be justly entitled.

Dated: October 29, 2025          Respectfully submitted,

/s/ Leonard W. Williamson         /s/ Bradley A. Benbrook
Leonard W. Williamson           Bradley A. Benbrook*
Oregon State Bar No. 910020      California Bar No. 177786
Van Ness Williamson LLP        Stephen M. Duvernay*
960 Liberty St. SE, Suite 100     California Bar No. 250957
Salem, Oregon 97302           Benbrook Law Group, PC
(503) 365-8800               701 University Avenue, Suite 106
l.williamson@vwllp.com         Sacramento, California 95825
                          (916) 447-4900
                          brad@benbrooklawgroup.com
                          steve@benbrooklawgroup.com

                          *Pro hac vice

                          Attorneys for Plaintiffs

| Page 1: [1] Deleted | Author |
| --- | --- |

| Page 1: [2] Formatted | Author |
| --- | --- |

Font: +Headings CS (Times New Roman)

| Page 1: [3] Deleted | Author |
| --- | --- |

| Page 1: [4] Formatted | Author |
| --- | --- |

Font: +Headings CS (Times New Roman)

| Page 1: [5] Deleted | Author |
| --- | --- |

1.

| Page 1: [6] Formatted | Author |
| --- | --- |

Font: +Headings CS (Times New Roman)

| Page 1: [7] Formatted | Author |
| --- | --- |

Font: +Headings CS (Times New Roman)

| Page 1: [8] Formatted | Author |
| --- | --- |

Font: +Headings CS (Times New Roman)

| Page 1: [9] Deleted | Author |
| --- | --- |

2.

| Page 1: [10] Formatted | Author |
| --- | --- |

Font: +Headings CS (Times New Roman)

| Page 1: [11] Formatted | Author |
| --- | --- |

Font: +Headings CS (Times New Roman)

| Page 1: [12] Formatted | Author |
| --- | --- |

Font: +Headings CS (Times New Roman)

| Page 1: [13] Formatted | Author |
| --- | --- |

Font: +Headings CS (Times New Roman)

| Page 1: [14] Deleted | Author |
| --- | --- |

3.

| Page 1: [15] Formatted | Author |
| --- | --- |

Font: +Headings CS (Times New Roman)

| Page 1: [16] Formatted | Author |
|---|---|

Font: +Headings CS (Times New Roman)

| Page 1: [17] Deleted | Author |
|---|---|

4.

| Page 1: [18] Formatted | Author |
|---|---|

Font: +Headings CS (Times New Roman)

| Page 1: [19] Formatted | Author |
|---|---|

Font: +Headings CS (Times New Roman)

| Page 1: [20] Formatted | Author |
|---|---|

Font: +Headings CS (Times New Roman)

| Page 2: [21] Deleted | Author |
|---|---|

5.

| Page 2: [22] Formatted | Author |
|---|---|

Font: +Headings CS (Times New Roman)

| Page 2: [23] Deleted | Author |
|---|---|

6.

| Page 2: [24] Formatted | Author |
|---|---|

Font: +Headings CS (Times New Roman)

| Page 2: [25] Deleted | Author |
|---|---|

7.

| Page 2: [26] Formatted | Author |
|---|---|

Font: +Headings CS (Times New Roman)

| Page 2: [27] Formatted | Author |
|---|---|

Font: +Headings CS (Times New Roman)

| Page 2: [28] Formatted | Author |
|---|---|

Font: +Headings CS (Times New Roman)

| Page 2: [29] Formatted | Author |
| --- | --- |

Font: +Headings CS (Times New Roman)

| Page 2: [30] Formatted | Author |
| --- | --- |

Font: +Headings CS (Times New Roman)

| Page 2: [31] Deleted | Author |
| --- | --- |

8.

| Page 2: [32] Formatted | Author |
| --- | --- |

Font: +Headings CS (Times New Roman)

| Page 2: [33] Deleted | Author |
| --- | --- |

9.

| Page 2: [34] Formatted | Author |
| --- | --- |

Font: +Headings CS (Times New Roman)

| Page 2: [35] Deleted | Author |
| --- | --- |

10.

| Page 2: [36] Formatted | Author |
| --- | --- |

Font: +Headings CS (Times New Roman)

| Page 2: [37] Formatted | Author |
| --- | --- |

Font: +Headings CS (Times New Roman)

| Page 2: [38] Formatted | Author |
| --- | --- |

Font: +Headings CS (Times New Roman)

| Page 2: [39] Formatted | Author |
| --- | --- |

Font: +Headings CS (Times New Roman)

| Page 2: [40] Formatted | Author |
| --- | --- |

Font: +Headings CS (Times New Roman)

| Page 2: [41] Deleted | Author |
| --- | --- |

11.

| Page 2: [42] Formatted | Author |
|---|---|

Font: +Headings CS (Times New Roman)

| Page 2: [43] Formatted | Author |
|---|---|

Font: +Headings CS (Times New Roman)

| Page 2: [44] Deleted | Author |
|---|---|

12.

| Page 2: [45] Formatted | Author |
|---|---|

Font: +Headings CS (Times New Roman)

| Page 2: [46] Formatted | Author |
|---|---|

Font: +Headings CS (Times New Roman)

| Page 2: [47] Formatted | Author |
|---|---|

Font: +Headings CS (Times New Roman)

| Page 2: [47] Formatted | Author |
|---|---|

Font: +Headings CS (Times New Roman)

| Page 2: [47] Formatted | Author |
|---|---|

Font: +Headings CS (Times New Roman)

| Page 2: [47] Formatted | Author |
|---|---|

Font: +Headings CS (Times New Roman)

| Page 2: [47] Formatted | Author |
|---|---|

Font: +Headings CS (Times New Roman)

| Page 2: [47] Formatted | Author |
|---|---|

Font: +Headings CS (Times New Roman)

| Page 2: [48] Formatted | Author |
|---|---|

Font: +Headings CS (Times New Roman)

| Page 2: [48] Formatted | Author |
|---|---|

Font: +Headings CS (Times New Roman)

| Page 2: [48] Formatted | Author |
|---|---|

Font: +Headings CS (Times New Roman)

| Page 20: [49] Deleted | Author |
|---|---|